## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHERRY J. WATERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 12-1840 |
| v. | ) | |
| | ) | **ELECTRONICALLY FILED** |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I.   INTRODUCTION

Sherry J. Waters ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 – 1383f ("Act").  This matter comes before the Court upon cross-motions for summary judgment.  (ECF Nos. 8, 10).  The record has been developed at the administrative level.  For the following reasons, Plaintiff's Motion for Summary Judgment will be DENIED, and Defendant's Motion for Summary Judgment will be GRANTED.

II.   **PROCEDURAL HISTORY**

Plaintiff filed for SSI with the Social Security Administration on February 2, 2010, claiming an inability to work due to disability beginning May 1, 2006.  (R. at 129 – 33)[1].  At that time, Plaintiff claimed to be unable to work as a result of depression, anxiety, and obesity.  (R. at 174).  Plaintiff was initially denied benefits on May 13, 2010.  (R. at 98 – 102).  A hearing was scheduled for June 7, 2011, and Plaintiff, represented by counsel, testified.  (R. at 67 – 88).  A vocational expert also testified.  (R. at 67 – 88).  The Administrative Law Judge ("ALJ") thereafter issued a decision denying benefits to Plaintiff on July 14, 2011.  (R. at 47 – 66).  Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, which request was denied on November 14, 2012, thereby making the decision of the ALJ the final decision of the Commissioner.  (R. at 1 – 9).

Plaintiff filed her Complaint in this Court on December 19, 2012.  (ECF No. 2).  Defendant filed an Answer on February 22, 2013.  (ECF No. 6).  Cross-motions for summary judgment followed.

III.  **STATEMENT OF THE CASE**

In his decision denying SSI to Plaintiff, the ALJ made the following findings:

1.  The claimant has not engaged in substantial gainful activity since May 28, 2009, the prior application filing date;
2.  The claimant has the following severe impairments: Major Depressive Disorder, Anxiety Disorder NOS, Personality Disorder NOS, Borderline Intelligence, History of Alcohol Abuse, and Obesity;
3.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1;
4.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 416.967(b) with the following non-exertional restrictions: avoid exposure to all hazards; limited to simple, routine, repetitive tasks; no significant change in work processes; no independent judgment or discretion;

---

[1]   Citations to ECF Nos. 6 – 6-22, the Record, *hereinafter*, "R. at __."

no piece-work or production-rate pace; no interaction with the general public; no more than incidental interaction with coworkers, defined as not more than a total of one-sixth of a routine work day may be dedicated to such interaction as is integral to the work process, however visible or audible contact at all other times is permissible, such that the claimant may be able to see or hear coworkers but no meaningful interaction would be required; and no reading, writing, or math for textual content, message recordation, or instruction compliance;

5. The claimant has no past relevant work;

6. The claimant was born on October 5, 1969 and was a younger individual age 18 – 49 on the date the prior application was filed;

7. The claimant has at least a high school education and is able to communicate in English;

8. Transferability of job skills is not an issue because the claimant does not have past relevant work;

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform;

10. The claimant has not been under a disability, as defined in the Social Security Act, since May 28, 2009, the date the prior application was filed.

(R. at 50 – 63).

## IV.    STANDARD OF REVIEW

This Court's review is plenary with respect to all questions of law.  *Schandeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999).  With respect to factual issues, judicial review is limited to determining whether the Commissioner's decision is "supported by substantial evidence."  42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F. 3d 43, 46 (3d Cir. 1994).  A United States District Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record.  *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 1190 – 1191 (3d Cir. 1986).  Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal

3

quotation marks omitted).  As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F. 3d 358, 360 (3d Cir. 1999).  "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F. 3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him [or her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Sec'y of Health & Human Serv.*, 841 F. 2d 57, 59 (3d Cir. 1988); *Kangas v. Bowen*, 823 F. 2d 775, 777 (3d Cir. 1987); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions.  He or she must make specific findings of fact. *Stewart v. Sec'y of Health, Educ. & Welfare*, 714 F. 2d 287, 290 (3d Cir. 1983).  The administrative law judge must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F. 2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F. 2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively delegated rule-making authority, has promulgated a five-step sequential evaluation process for the purpose

of determining whether a claimant is "disabled" within the meaning of the Act.  The United

States Supreme Court recently summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity."[20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24 – 25 (2003) (footnotes omitted).

In an action in which review of an administrative determination is sought, the agency's

decision cannot be affirmed on a ground other than that actually relied upon by the agency in

making its decision.  In *Sec. & Exch. Comm'r v. Chenery Corp.*, 332 U.S. 194

(1947), the Supreme Court explained:

> When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*Chenery Corp.*, 332 U.S. at 196.

The United States Court of Appeals for the Third Circuit has recognized the applicability of this rule in the Social Security disability context.  *Fargnoli v. Massanari*, 247 F. 3d 34, 44, n. 7 (3d Cir. 2001).  Thus, the Court's review is limited to the four corners of the ALJ's decision.

## V.   DISCUSSION

In her brief, Plaintiff argues that the ALJ committed error requiring either reversal or remand, because he failed to adequately develop the record in order to properly assess Plaintiff's eligibility for benefits under 20 C.F.R., Pt. 404, Subpt. P, App'x 1, Listing 12.05 (Mental Retardation), he failed to accord due weight to Plaintiff's treating psychiatrist's opinion regarding disability, he failed to accord due weight to a number of low global assessment of functioning[2] ("GAF") scores found in the record, and he credited testimony provided by the vocational expert that was not supported by the Dictionary of Occupational Titles ("DOT"). (ECF No. 11 at 8 – 15).  Defendant counters that the ALJ properly supported his decision with substantial evidence from the record, and should be affirmed by this Court.  (ECF No. 9 at 9 – 12).  The Court agrees with Defendant.

---

[2]        The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000).  An individual with a GAF score of 91 – 100 exhibits "[s]uperior functioning in a wide range of activities" and "no symptoms;" of 81 – 90 exhibits few, if any, symptoms and "good functioning in all areas," is "interested and involved in a wide range of activities," is "socially effective," is "generally satisfied with life," and experiences no more than "everyday problems or concerns;" of 71 – 80, may exhibit "transient and expectable reactions to psychosocial stressors" and "no more than slight impairment in social, occupational, or school functioning;" of 61 – 70 may have "[s]ome mild symptoms" or "some difficulty in social, occupational, or school functioning, but generally functioning pretty well" and "has some meaningful interpersonal relationships;" of 51 – 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 41 – 50 may have "[s]erious symptoms (e.g., suicidal ideation …)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 31 – 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood;" of 21 – 30 may be "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., … suicidal preoccupation)" or "inability to function in almost all areas;" of 11 – 20 may have "[s]ome danger of hurting self or others" or "occasionally fails to maintain minimal personal hygiene" or "gross impairment in communication;" of 1 – 10 may have "[p]ersistent danger of severely hurting self or others" or "persistent inability to maintain minimal personal hygiene" or "serious suicidal act with clear expectation of death." *Id.*

In terms of Plaintiff's first argument, it is alleged that Plaintiff met a portion of the requirements for disability under Listing 12.05, and that Plaintiff would likely have qualified entirely under Listing 12.05 if the ALJ had properly developed the record.  (ECF No. 11 at 8 – 12).  However, the Court finds that Plaintiff is incorrect in both aspects of this argument, and has confused her burdens with what is required of the ALJ when undertaking an impartial review of the record.

12.05(C) provides that:

Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;

Or

B. A valid verbal, performance, or full scale IQ of 59 or less;

Or

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

Or

D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R., Pt. 404, Subpt. P, App'x 1, Listing 12.05.  Plaintiff fails to identify under which section of 12.05 she would qualify.  Regardless, Plaintiff fails to demonstrate that she experienced deficits in adaptive functioning prior to age twenty-two, fails to provide any evidence of an IQ score in any of the required ranges under 12.05, and fails to provide evidence of marked limitations in functional ability.

Plaintiff argues that she was not required to provide evidence of a specific diagnosis of "mental retardation," and that "[e]vidence of a qualifying deficit in adult cognitive functioning serves as *prima facie* evidence that those deficits existed prior to a social security claimant's twenty-second birthday."  (ECF No. 11 at 9).  While a diagnosis of mental retardation may not be a dispositive factor when making a decision with respect to qualification under 12.05, the lack of such a diagnosis amongst multiple treating and examining mental health professionals is certainly relevant to determining whether a claimant qualifies for a listing specifically created to address mental retardation.  Treating sources made no mention of mental retardation, and consultative examiners indicated that Plaintiff suffered only borderline to low-average intellectual functioning.

The United States Court of Appeals for the Third Circuit has rejected the idea that there is a presumption that mental impairment existed during the developmental period.  *Cortes v. Comm'r of Soc. Sec.*, 255 Fed. App'x 646, 652 (3d Cir. 2007) (citing *Williams v. Sullivan*, 970 F. 2d 1178, 1185 (3d Cir. 1992)).  In order for the court to infer that deficits in adaptive functioning existed during the developmental period, a claimant must provide evidence that demonstrates or supports onset prior to age twenty-two.  *Id.* at 653; *Markle v. Barnhart*, 324 F. 3d 182, 189 (3d Cir. 2003).

Here, Plaintiff did not provide any objective evidence of deficits in adaptive functioning prior to reaching the age of twenty-two, such as school records, and instead relied upon only her personal testimony and her personal reports to examining physicians.  A claimant fails to carry her burden of proof at Step 3 when she does not present documentary or other objective evidence to substantiate her testimony that she was placed in special education or otherwise experienced deficits in adaptive functioning.  *Gist v. Barnhart*, 67 Fed. App'x 78, 82 (3d Cir. 2003).

Plaintiff argues, however, that this lack of evidence was the result of a failure on the part of the ALJ to adequately develop the record.  The Court does not agree.  It is certainly true that an ALJ has a "duty to develop a full and fair record," and "must secure relevant information regarding a claimant's entitlement to social security benefits."  *Ventura v. Shalala*, 55 F. 3d 900, 902 (3d Cir. 1995).  Due regard must be given to the "beneficent purposes" of the Social Security Act.  *Id.*  Yet, a claimant still bears the ultimate burden of producing sufficient evidence to demonstrate disability.  *Schwartz v. Halter*, 134 F. Supp. 2d 640, 656 (E.D. Pa. 2001).  Although the Act "provides an applicant with assistance to prove his claim, the ALJ does not have a duty to search for all of the relevant evidence available, because such a requirement would shift the burden of proof."  *Id.* (citing *Hess v. Sec'y of Health, Educ., and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974)).  Plaintiff had ample opportunity to seek her educational records before and after her administrative hearing, and did not do so.  (R. at 87 – 88).  Neither did she indicate to the ALJ that such records should have been sought, or that she required assistance in obtaining said records.  The ALJ was not required to prove this portion of Plaintiff's claim.

Plaintiff also believes that the ALJ was required to order additional testing and seek out evidence which would support her claim of low IQ qualifying under Listing 12.05.  Again, the Court must disagree.  Remand for further administrative proceedings to obtain additional

intelligence testing or medical testimony is justified "only in circumstances where the medical evidence suggests that a finding of medical equivalence to a listing is reasonable." *Gist*, 67 Fed. App'x at 82.

On September 15, 2009, psychologist Sandy Vujnovic, Ph.D. completed a consultative Clinical Review and Mini Mental Status Examination of Plaintiff. (R. at 274 – 79). Plaintiff complained of depression, anxiety, and panic attacks. (R. at 274). Plaintiff described the symptoms of her depression in terms of constant crying, social isolation, and oversleeping. (R. at 274). She was "quite vague" with respect to the symptoms of her panic and anxiety, saying only that she "worries about everything," and felt "on edge." (R. at 274). Plaintiff claimed to suffer panic attacks two to three times per day, but could not articulate the symptoms of a panic attack. (R. at 274). Plaintiff informed Dr. Vujnovic that she had been seeing a counselor since May 2009, and was taking prescription medication. (R. at 274). Plaintiff's primary stressors were family problems. Plaintiff was twice married and twice divorced. She had a son to each former spouse. (R. at 276). She lost custody of her youngest son, but was vague as to the reasons. (R. at 276). Plaintiff lived with a boyfriend of two-and-a-half years. (R. at 276). (R. at 274). She had a history of overdose on prescription medications. (R. at 274).

While Plaintiff reported that she was only a social drinker, Dr. Vujnovic noted that her medical history indicated that she consumed up to twelve drinks at a time on the weekends, and that she drank beer and mixed drinks frequently, in general. (R. at 275). Plaintiff stated that she completed high school, with special education classes for reading and mathematics. (R. at 275). She thereafter worked in the home healthcare field, her longest job lasting two or three years. (R. at 275). Plaintiff believed that she could no longer work due to depression and nervousness. (R. at 275).

Dr. Vujnovic observed Plaintiff to arrive on time for her appointment.  (R. at 176). Plaintiff was dressed casually, and her grooming was adequate.  (R. at 176).  She appeared to be of low-average intelligence.  (R. at 276).  Her affect was flat, and her mood appeared to be depressed.  (R. at 276).  Plaintiff denied suicidal ideation.  (R. at 276).  She was fully oriented, she could recall two out of three items after a brief period, suggesting some difficulty with short term memory, she had difficulty with serial 7's, but could spell backwards, suggesting no problems with concentration, her language and motor skills were intact, she demonstrated difficulty with manipulating numbers and maintaining attention, and she had no difficulty with abstract thinking or reasoning.  (R. at 276 – 77).  Dr. Vujnovic concluded that Plaintiff had mild cognitive impairment.  (R. at 277).  Plaintiff was diagnosed with anxiety disorder NOS, and personality disorder NOS.  (R. at 277).  As a result, Plaintiff would have moderate limitation with respect to understanding and remembering detailed instructions, interacting appropriately with the public, and responding appropriately to work pressures in a usual work setting.  (R. at 278 – 79).

A Mental Residual Functional Capacity Assessment ("RFC") of Plaintiff was completed by state agency evaluator Douglas Schiller, Ph.D. on September 23, 2009.  (R. at 281 – 83). Based upon his review of the medical record, Dr. Schiller determined that the evidence supported severe impairment in the way of affective disorders, anxiety-related disorders, and personality disorders.  (R. at 281).  As a result, Plaintiff would experience moderate limitations with respect to maintaining attention and concentration for extended periods, performing activities within a schedule, maintaining regular attendance, being punctual within customary tolerances, completing a normal work day and work week without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest

periods, accepting instructions and responding appropriately to criticism from supervisors, getting along with co-workers, responding appropriately to changes in the work setting, setting realistic goals, and planning independently. (R. at 282). Nonetheless, Dr. Schiller believed that Plaintiff would be capable of working a full-time job. (R. at 283).

Dr. Schiller gave great weight to the findings of Dr. Vujnovic, and opined that the record supported a finding that Plaintiff maintained the ability to perform work involving short, simple instructions. (R. at 283). In a Psychiatric Review Technique also completed by Dr. Schiller, Plaintiff's symptoms were determined not to meet any listed impairment under 20 C.F.R., Pt. 404, Subpt. P, App'x 1. He did find, however, that she was moderately limited with respect to activities of daily living, social functioning, and maintaining concentration, persistence, and pace. (R. at 294). She had one or two episodes of decompensation of extended duration. (R. at 294).

On April 16, 2010, Michael Crabtree, Ph.D. completed a consultative psychological evaluation of Plaintiff on behalf of the Bureau of Disability Determination. (R. at 363 – 71). He initially noted that Plaintiff drove herself to the appointment, and was dressed neatly and casually. (R. at 363). There was nothing unusual about her manners, she was cooperative, and she was self-sufficient. (R. at 363).

Plaintiff reported that she was somewhat depressed every day, but managed to find pleasure in some things. (R. at 365). The loss of custody of her youngest son had a particularly profound effect on her. (R. at 365). Plaintiff obtained adequate sleep with the use of prescription medication. (R. at 365). She claimed to experience periods of psychomotor retardation, fatigue, guilt, worthlessness, and difficulty concentrating. (R. at 365). She denied suicide attempts, and asserted that her past overdose was unintentional. (R. at 365). She had

been treating with a psychiatrist for approximately two years.  (R. at 363).  She reported one hospital admission for prescription medication overdose two months prior to her evaluation with Dr. Crabtree.  (R. at 363).  Plaintiff was very vague about her alcohol use and its effect on her well-being.  (R. at 364).

Plaintiff explained that she graduated from high school, but had a learning disability that caused difficulty with English, history, and mathematics.  (R. at 364).  She was in learning support all twelve years of school.  (R. at 364).  Plaintiff stated that she had been twice married, and had two children.  (R. at 364).  She had lost custody of the younger child.  (R. at 364).  Plaintiff last worked in 2008 providing in-home care.  (R. at 364).  Plaintiff had friends and spoke with them on the telephone.  (R. at 364).

Dr. Crabtree found Plaintiff's appearance to be without note.  (R. at 364).  She spoke clearly and was easily understood.  (R. at 364).  Her affect was non-reactive, and she was very matter-of-fact.  (R. at 365).  Plaintiff's stream of thought was adequate, and she denied preoccupations.  (R. at 365).  Plaintiff's store of information suggested borderline intellectual functioning.  (R. at 366).  She correctly answered fourteen of twenty-four questions from the Wechsler Adult Intelligence Scale list.  (R. at 366).  Her abstract thinking was stronger than her store of information.  (R. at 366).  She did well comparing objects.  (R. at 366).  She demonstrated adequate concentration.  (R. at 366).  Her memory was somewhat weak.  (R. at 366).  Plaintiff's judgment was consistent with her level of intelligence.  (R. at 367).  Plaintiff had adequate insight.  (R. at 367).

Dr. Crabtree opined that Plaintiff's prognosis was poor given a lack of motivation and depressive thinking.  (R. at 368).  She was unlikely to be able to manage her own benefits due to a history of gambling.  (R. at 368).  Plaintiff was, however, capable of sustaining all activities of

daily living, and could function adequately in a social setting.  (R. at 368).  Concentration, persistence, and pace were less than average, but still in the non-pathologically reduced category.  (R. at 368).  Dr. Crabtree diagnosed moderate, recurrent major depressive disorder and borderline intelligence.  (R. at 367).  As a result, he believed that she would experience moderate limitation with respect to understanding, remembering, and carrying out any instructions, and interacting appropriately with the public.  (R. at 370).

A Mental RFC of Plaintiff was completed by state agency evaluator Sandra Banks, Ph.D. on April 26, 2010.  (R. at 372 – 75).  Based upon her review of the medical record, Dr. Banks determined that the evidence supported finding impairment in the way of affective disorders, mental retardation, anxiety-related disorders, and substance addiction disorders.  (R. at 372).  As a result, Plaintiff would likely experience moderate limitation understanding, remembering, and carrying out all instructions, maintaining attention and concentration for extended periods, performing activities within a schedule, maintaining regular attendance, being punctual within customary tolerances, sustaining an ordinary routine without special supervision, working in coordination with or proximity to others without being distracted, completing a normal work day and work week without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, interacting appropriately with the general public, and accepting instructions and responding appropriately to criticism from supervisors.  (R. at 373).  Nonetheless, Dr. Banks concluded that Plaintiff was still capable of sustaining full-time employment, if limited to simple, routine, repetitive work in a stable environment.  (R. at 374).  She could manage the mental demands of jobs not requiring complicated tasks.  (R. at 374).  Dr. Crabtree's assessment of Plaintiff's capabilities was considered to be consistent with Dr. Banks'.  (R. at 374).

In a Psychiatric Review Technique completed by Dr. Banks on April 26, 2010, she did not find Plaintiff to qualify for disability under any of the relevant listings in 20 C.F.R., Pt. 404, Subpt. P, App'x 1.  She further found that Plaintiff could be expected to experience only mild limitation in activities of daily living, and moderate limitation in social functioning, concentration, persistence, and pace.  (R. at 386).  No repeated episodes of decompensation of extended duration were noted.  (R. at 386).

On February 23, 2011, Plaintiff's treating psychiatrist Ravindra K. Mehta, M.D. completed a Pennsylvania Department of Public Welfare Employability Assessment Form on Plaintiff's behalf, indicating that Plaintiff was permanently disabled as a result of major depressive disorder and generalized anxiety.  (R. at 390 – 91).  No mention was made of intellectual deficits, although earlier treatment notes indicated the existence of some undefined learning disability.  (R. at 299).

An administrative law judge and the Appeals Council must obtain an updated medical opinion from a medical expert in the following circumstances:

> When no additional medical evidence is received, but *in the opinion of the administrative law judge* or the Appeals Council the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable; or

> When additional medical evidence is received that *in the opinion of the administrative law judge* or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments.

S.S.R. 96-6p at *3 – 4 (emphasis added).  Examining medical professionals considered Plaintiff to experience – at worst – borderline to low-average intelligence.  While she had difficulties with certain tasks, there was no indication that Plaintiff's intellect precluded her from working.  State agency evaluators found that Plaintiff did not meet Listing 12.05.  Based upon this evidence,

15

there is no reason to believe that the ALJ did not adequately develop the record with respect to Plaintiff's intellectual functioning.  The ALJ's decision at Step 3 was supported by substantial evidence.  (R. at 55 – 56).

Plaintiff next argues that her treating's psychiatrist's opinion regarding her ability to work, as well as multiple low GAF scores within the record were not given appropriate consideration.  (ECF No. 11 at 12 – 14).  As mentioned above, on February 23, 2011, Dr. Mehta completed a Pennsylvania Department of Public Welfare Employability Assessment Form on Plaintiff's behalf, indicating that Plaintiff was permanently disabled as a result of major depressive disorder and generalized anxiety.  (R. at 390 – 91).  No narrative findings accompanied this report.

In treatment notes reaching back to July 17, 2009, Plaintiff was noted to have a learning disability, she owned her own home, she lived with a boyfriend, and she had two children.  (R. at 299).  She denied any substance abuse in her past.  (R. at 299).  Plaintiff was anxious and depressed, but denied suicidal thoughts.  (R. at 300).  Her judgment and insight were considered to be impaired.  (R. at 300).  She was diagnosed with major depression.  (R. at 300).  Dr. Mehta prescribed Wellbutrin.  (R. at 300).  Her GAF score at the time was 10.  (R. at 548).  Medical records reveal that Plaintiff continued to treat with Dr. Mehta and a therapist through February 2011.  (R. at 547 – 610).

Plaintiff was evaluated again by Dr. Mehta on September 2, 2009.  (R. at 301).  Her affect was constricted, her mood was anxious, angry, and labile, her concentration was fair, her thinking was disorganized and illogical, she denied suicidal ideation, her memory, judgment, and insight were all intact, and she reported no medication side effects.  (R. at 301).  Dr. Mehta diagnosed bipolar disorder, and prescribed Lamictal.  (R. at 302).  Plaintiff's GAF score was 30.

(R. at 302).  Treatment records that followed were generally the same, with some slight improvement over time.  (R. at 547 – 610).  Plaintiff was frequently noted to be "doing fairly." (R. at 547 – 610).  Plaintiff's depression was linked to environmental stressors such as her children and caring for her mother, and her poor finances and unemployment.  (R. at 547 – 610).

In addition to this treatment history with Dr. Mehta, and the earlier discussed evaluations of Drs. Vujnovic, Schiller, Crabtree, and Banks, Plaintiff also had a record of hospitalizations. On September 3, 2009, Plaintiff appeared in the emergency department of Monongahela Valley Hospital due to intentional overdose of Xanax.  (R. at 256).  She had a noted history of depression and relationship stressors.  (R. at 256).  The severity of her symptoms was considered to be mild to moderate.  (R. at 256).  Plaintiff denied that the overdose was attempted suicide, and claimed that anxiety about the loss of custody of her youngest son resulted in an inability to sleep for four straight days.  (R. at 259).  She reported to different doctors that she took varying quantities of Xanax – between thirty and fifty – in an effort to fall asleep.  (R. at 259, 261). Plaintiff recovered well, but had a depressed mood, bland affect, and slow speech.  (R. at 261). Her thoughts were focused, she denied suicidal ideation, her concentration was good, and her memory was intact, but her insight and judgment were poor.  (R. at 261).  Plaintiff denied the chronic use of alcohol and past drug abuse.  (R. at 262).  Plaintiff was diagnosed with major depressive disorder, and was assigned a GAF score of 25.  (R. at 262).  Plaintiff was transferred to the hospital's behavioral health unit.  (R. at 262).

Plaintiff self-discharged from the behavioral health unit against medical advice on September 9, 2009.  (R. at 321).  She was to follow up with Dr. Mehta.  (R. at 321).  At the time she had been prescribed Zoloft and Seroquel.  (R. at 322).  Her mood was somewhat irritable, her affect was modulated, her speech was fluent and clear, her thoughts were organized and goal

directed, she denied suicidal thinking, she was alert and oriented, her memory was intact, and her insight and judgment were fair.  (R. at 322).  She was diagnosed with major depressive disorder. (R. at 322).  She was assigned a GAF score of 35.  (R. at 322).

On October 6, 2009, Plaintiff again visited the emergency department of Monongahela Valley Hospital.  (R. at 312).  She was depressed and had reportedly been drinking alcohol for days.  (R. at 312 – 13).  She had mildly to moderately altered mental status.  (R. at 312).  She was discharged after contracting for her safety.

On June 9, 2010, Plaintiff was admitted to Southwest Regional Medical Center's inpatient behavior health service following a prescription drug overdose admission at UPMC Shadyside Hospital.  (R. at 404).  Alcohol ingestion was also noted.  (R. at 404).  Plaintiff claimed to have a nervous breakdown.  (R. at 404).  She felt hopeless, helpless, and depressed. (R. at 404).  She claimed to experience panic attacks and angry outbursts.  (R. at 404).  In her psychiatric evaluation, Plaintiff was noted to be depressed, anxious, restless, alert, and oriented. (R. at 405).  Her intelligence was average, her abstract reasoning was intact, her judgment and insight were mildly impaired, her memory was intact, and her fund of knowledge was intact.  (R. at 405).  Plaintiff was diagnosed with severe major depressive disorder.  (R. at 406).  Plaintiff made improvements while at Southwest Regional Medical Center, and denied adverse medication side effects.  (R. at 415 – 16).  While in treatment, Plaintiff made equivocal statements about past substance abuse, stating that she did not have drug or alcohol use issues, but also admitting to past cocaine use, and to continued alcohol consumption to cope with her problems.  (R. at 472, 485).  She was discharged on June 15, 2010.  (R. at 418).  She was happy, pleasant, cooperative, sociable, and alert.  (R. at 418).  She denied suicidal ideation, but still struggled with depression.  (R. at 478).

On January 1, 2011, Plaintiff was again admitted to Monongahela Valley Hospital for intentional overdose.  (R. at 509).  She intended to end her life, because she no longer wished for her children to see her cry.  (R. at 509).  Her home was allegedly going into foreclosure, and her sons were in the custody of their fathers.  (R. at 509).  Plaintiff was medically stable.  (R. at 509).  She had a noted history of depression, anxiety, panic attacks, and questionable alcohol abuse.  (R. at 509 – 10).  Plaintiff denied any use of drugs or alcohol.  (R. at 537).  She was to be transferred to the mental health ward.  (R. at 510).  This was Plaintiff's third recorded overdose.  (R. at 512).  She was diagnosed with bipolar disorder, depressed, and was assigned a GAF score of 25.  (R. at 512).

Plaintiff self-discharged against medical advice on January 15, 2011.  (R. at 531).  Plaintiff was prescribed Wellbutrin, Seroquel, Xanax, and Depakote.  (R. at 531).  She was advised to follow up with Dr. Mehta.  (R. at 531).  She was diagnosed with bipolar disorder, depressed, and was assigned a GAF score of 40.  (R. at 531).

Treatment records from Plaintiff's primary care physicians, Sheila M. Anderson, D.O., and Theresa J. Lacava, M.D., reported that Plaintiff began to feel depressed and anxious following the loss of custody of her youngest child.  (R. at 236 – 37).  Plaintiff had a noted history of consuming up to twelve mixed alcohol drinks on Fridays and Saturdays, as well as six bottles of beer/mixed drinks on a frequent basis.  (R. at 236 – 37).  Plaintiff was diagnosed with situational depression and insomnia.  (R. at 236 – 37).  Nonetheless, Plaintiff was self-reliant in usual daily activities.  (R. at 236 – 37).  She denied suicidal thoughts.  (R. at 236 – 37).  Dr. Anderson prescribed Ambien and Celexa, and noted that Plaintiff was to see Dr. Mehta for continued counseling.  (R. at 236 – 37, 227).  Plaintiff reported improvement with therapy.  (R.

at 237).   Treatment notes also included findings indicating a history of drug abuse, and avoiding

provision of potentially addictive prescription medications.   (R. at 222 – 34, 238 – 45).

Plaintiff undoubtedly has a significant history of mental illness.   Dr. Mehta believed that

Plaintiff was disabled, and he consistently assigned low GAF scores to Plaintiff during her time

under his care.   However, the ALJ's decision to decline according significant weight to these

findings was supported by substantial evidence.   A treating physician's opinions may be entitled

to great weight – considered conclusive unless directly contradicted by evidence in a claimant's

medical record – particularly where the physician's findings are based upon "continuing

observation of the patient's condition over a prolonged period of time."   *Brownawell v. Comm'r*

*of Soc. Sec.*, 554 F. 3d 352, 355 (3d Cir. 2008) (quoting *Morales v. Apfel*, 225 F. 3d 310, 317 (3d

Cir. 2000)); *Plummer v. Apfel*, 186 F. 3d 422, 429 (3d Cir. 1999) (citing *Rocco v. Heckler* 826 F.

2d 1348, 1350 (3d Cir. 1987)).   However, "the opinion of a treating physician does not bind the

ALJ on the issue of functional capacity."   *Chandler v. Comm'r of Soc. Sec.*, 667 F. 3d 356, 361

(quoting *Brown v. Astrue*, 649 F. 3d 193, 197 n. 2 (3d Cir. 2011)).   A showing of contradictory

evidence and an accompanying explanation will allow an ALJ to reject a treating physician's

opinion outright, or accord it less weight.   *Brownawell*, 554 F. 3d at 355.   Moreover, a medical

opinion is not entitled to any weight if unsupported by objective evidence in the medical record.

*Plummer*, 186 F. 3d at 430 (citing *Jones v. Sullivan*, 954 F. 2d 125, 129 (3d Cir. 1991)).   The

determination of disabled status for purposes of receiving benefits – a decision reserved for the

Commissioner, only – will not be affected by a medical source simply because it states that a

claimant is disabled or unable to work.   20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2).

The ALJ disregarded the findings of Dr. Mehta, because Dr. Mehta's disability findings

conflicted with the less severe findings of two examining medical professionals, and two

evaluating medical professionals – none of which made limitations findings which precluded Plaintiff from working.  Plaintiff underscored intervening events – such as hospitalizations – which allegedly lessened the probative value of these evaluations.  However, it has been held that "because state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision.  The Social Security Regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it." *Chandler*, 667 F. 3d at 361.

As explained by the ALJ, these hospitalizations were individual events which punctuated a larger mental health record in which consultative examiners and state agency evaluators came to largely the same conclusions over a period of years.  (R. at 56 – 61).  The GAF scores provided during the hospitalizations were not representative of Plaintiff's longitudinal history, but only her mental status at the time of her hospitalization.  (R. at 56 – 61).  The ALJ further rejected Dr. Mehta's findings and GAF scores not only because of the conflict with other examining and evaluating medical sources, but because Dr. Mehta's findings were based upon subjective complaints from a Plaintiff that the ALJ considered to be less than fully reliable.  (R. at 56 – 61).  The ALJ noted continuing inconsistencies in Plaintiff's reports of drug and alcohol abuse and activities of daily living for support.  (R. at 56 – 61).

In cases such as the one at present, the Court recognizes that "when the medical testimony or conclusions are conflicting, the ALJ is not only entitled but required to choose between them." *Cotter v. Harris*, 642 F. 2d 700, 705 (3d Cir. 1981).  The ALJ must provide an explanation supported by substantial evidence to justify the rejection of pertinent evidence. *Fargnoli v. Massanari*, 247 F. 3d 34, 43 (3d Cir. 2001).  However, the Court must reiterate that substantial evidence "does not mean a large or considerable amount of evidence, but rather such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce*, 487 U.S. at 565. "Overall, the substantial evidence standard is a deferential standard of review." *Jones*, 364 F. 3d at 503. In light of this standard and the ALJ's discussion, the Court finds that the ALJ met his burden, here.

Finally, Plaintiff contends that the vocational expert's responses to the ALJ's hypothetical questions were not supported by the DOT. (ECF No. 14 – 15). Specifically, the ALJ limited Plaintiff to occupations requiring "no piece-work or production-work pace, and "no reading, writing, or math for textual content, message recordation, or instruction compliance." (R. at 56). The jobs provided by the vocational expert allegedly did not accommodate the above functional limitations. The vocational expert identified three jobs for which she believed Plaintiff would qualify: "laundry worker, unskilled, SVP 2, light exertion," "marker, unskilled, SVP 2, light exertion," and "garment bagger, unskilled, SVP 1, light exertion." (R. at 86). In response to questioning by the ALJ, the vocational expert also stated that her testimony comported with the DOT. (R. at 62, 87). Presently, Plaintiff argues that not only does the "garment bagger" position not exist in the DOT, but that characteristics of the other two positions conflict with the hypothetical and RFC assessment adopted by the ALJ.

The United States Court of Appeals for the Third Circuit has held that inconsistencies between a vocational expert's testimony and the DOT does not necessarily render a Step 5 determination devoid of substantial evidence, meriting remand. *Rutherford v. Barnhart*, 399 F. 3d 546, 557 (3d Cir. 2005) (citing *Boone v. Barnhart*, 353 F. 3d 203, 209 (3d Cir. 2003); *Jones v. Barnhart*, 364 F. 3d 501, 506 (3d Cir. 2004)). While the Court acknowledges that the position of "garment bagger" does not exist in the DOT, this, alone, is not sufficient to require remand.

Plaintiff objects to the use of "laundry worker," and "marker," because both involve "performing repetitive work, or performing continuously the same work, according to set procedures, sequence, or pace." (ECF No. 11 at 15). Plaintiff would have the Court believe that the inclusion of the word "pace" in this definition means that both jobs run afoul of the ALJ's hypothetical limiting piece-work or production-work pace. This is not necessarily the case. According to the definition provided by Plaintiff, the two positions could involve only performing repetitive work, *or* only performing according to set procedures, sequence, *or* pace, *or* some combination of the above. Plaintiff has not proven any conflict. The vocational expert may have restricted Plaintiff to "laundry worker" and "marker" jobs requiring only performing repetitive work. The Court finds no explicit conflict, here.

Plaintiff next argues that the "marker" position requires carrying out "detailed but uninvolved written [sic] oral instructions." (ECF No. 11 at 15). This allegedly conflicts with the ALJ's hypothetical limitation with respect to "no reading, writing, or math for textual content, message recordation, or instruction compliance." Plaintiff provides no citation for this requirement. The Court notes that the DOT requires the most minimal level of language and mathematics skills for the "marker" position cited by Plaintiff at 920.687-126. The vocational expert's testimony appears, therefore, to be in accord with the DOT. Even if this were not the case, Plaintiff would still be eligible for 100,000 "laundry worker" positions. As such, the Court will not remand. Incidentally, as to Plaintiff's peripheral claim that the ALJ's hypothetical should have been more restrictive, Plaintiff provides no evidence for support. (ECF No. 11 at 15).

**VI.**	**CONCLUSION**

Based upon the foregoing, the court finds that substantial evidence supported the ALJ's

RFC assessment.  Accordingly, Plaintiff's Motion for Summary Judgment will be denied;

Defendant's Motion for Summary Judgment will be granted; and, the decision of the ALJ will be

affirmed.  Appropriate orders follow.


/s Arthur J. Schwab
Arthur J. Schwab
United States District Judge

cc/ecf:  All counsel of record.